# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES DEWEESE, | : | |
| Plaintiff | : | NO. 1:CV-03-490 |
| | : | |
| v. | : | |
| | : | JUDGE RAMBO |
| WARDEN DOMINICK DEROSE | : | |
| and DAUPHIN COUNTY, | : | JURY TRIAL DEMANDED |
| Defendant | : | |

## DEFENDANT'S APPENDIX OF EXHIBITS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Exhibit "A"        Unsworn Declaration of
Warden DeRose

Exhibit "B"        Unsworn Declaration of
Deputy Warden Leonard Carroll

Exhibit "C"        Unsworn Declaration of
Deputy Warden Elizabeth Nichols

Exhibit "D"        Unsworn Declaration of
Major Dennis Stewart

Exhibit "E"        Unsworn Declaration of
Mark Templeton

Exhibit "F"        Deposition testimony of
Commissioner Anthony Petrucci

FILED
HARRISBURG, PA

DEC 10 2003

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

Respectfully submitted,

Lavery, Faherty, Young & Patterson, P.C.

By:_____

Frank J. Lavery, Jr., Esquire
225 Market Street, Suite 304
P.O. Box 1245
Harrisburg, PA 17108-1245
(717) 233-6633 (telephone)
(717) 233-7003 (facsimile)
Atty No. PA42370
flavery@laverylaw.com
Attys for Defendants

DATE:  December 10, 2003

## <u>CERTIFICATE OF SERVICE</u>

I, Linda L. Gustin, an employee with the law firm of Lavery, Faherty, Young & Patterson, P.C., do hereby certify that on this 10th day of December, 2003,  I served a true and correct copy of the foregoing **Defendants' Appendix of Exhibits in Support of Motion for Summary Judgment** via U.S. First Class Mail, postage prepaid, as follows:

Don Bailey, Esquire
Bailey, Stretton & Ostrowski
4311 North Sixth Street
Harrisburg, PA  17110

_Linda L. Gustin_
Linda L. Gustin
Legal Secretary to Frank J. Lavery, Jr., Esq.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES DEWEESE,            :

          Plaintiff      :    NO. 1:CV-03-490

                      :

    v.               :

                      :    JUDGE RAMBO

WARDEN DOMINICK DEROSE  :

and DAUPHIN COUNTY,      :    JURY TRIAL DEMANDED

          Defendant   :

### UNSWORN DECLARATION OF DOMINICK DeROSE

I, Dominick DeRose, do hereby state under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following are true and correct based upon my own personal knowledge:

1.     I am currently employed as the Warden at the Dauphin County Prison and have been continuously employed in that capacity since July, 1992. I served as the Acting Warden from March, 1991 until July, 1992.

2.     The current inmate population at the Dauphin County Prison is approximately 970 inmates, not counting those individuals assigned to the Work Release Center.

3.     The Dauphin County Board of Prison Inspectors provides oversight for and establishes policy for the Dauphin County Prison. The Dauphin County Board of Prison Inspectors is comprised of three County Commissioners, the President



Judge and/or his designee, the District Attorney, the Sheriff and the County Controller.   District Justice Yannich serves as an ex officio representative of the minor judiciary on the Board. At no time has the Prison Board delegated policy making responsibility to me.

4.     The current staffing level at the Dauphin County Prison is 294 County employees with approximately 21 vacancies.  Since at least 1999, there has been a general hiring freeze imposed by the Dauphin County Commissioners.

5.     Of the 294 positions at the Dauphin County Prison, only 28 are non-union positions (24 fulltime, 3 part-time, and 1 grant).   All union employees' salaries and benefits are dictated by the various collective bargaining agreements.

6.     The Dauphin County Salary Board and eventually the Dauphin County Commissioners make the final determination as to annual compensation for non-union employees.    At no time have the Salary Board and/or the County Commissioners delegated authority to me to determine compensation.

7.     As Warden, I recommend annual pay increases for non-union staff, including, but not limited to, the three Deputy Wardens, the Custody Major, Human Resources Director, other supervisors, Business Office, and clerical staff as part of the budget process.

8.    In 2002, the County Commissioners implemented a new pay for performance evaluation system for employee compensation in 2003.  Previously, there were automatic cost-of-living increases.

9.    Under the new pay for performance evaluation scale, I was able to recommend a 2%, 4% or 6% increase based upon the employee's performance, however, the Salary Board and then the County Commissioners still make the final determination on compensation.  As the system was explained by the Chief Clerk, whenever a department head would recommend a 6% increase, then he or she would have to offset that recommendation by recommending a 2% increase for another individual or by finding some other source of funding within the department's budget.

10.    During the 2002 pay for performance evaluation, I gave Deputy Warden DeWees an overall rating of satisfactory and recommended that Plaintiff receive a 4% pay increase for 2003.  Deputy Warden DeWees was satisfied with his evaluation and pay raise until he learned that Deputy Wardens Carroll and Nichols had received 6% pay raises.

11.    During the 2002 pay for performance evaluations, I gave Deputy Wardens Carroll and Nichols an overall rating of exceeds expectations (the employee exceeds the standards of the job on a regular basis in several areas) and

recommended a 6% pay increase for them for performance above and beyond the call of duty.

12.   In my professional opinion, Plaintiff's performance, attitude and demeanor had been deteriorating for several years; I repeatedly instructed Plaintiff of his need to take appropriate supervisory action with regard to the conduct of his subordinates; and that he has failed to impose discipline or enforce the rules. Plaintiff does not communicate effectively with his subordinates; he constantly avoids conflict; fails to manage his own staff; and routinely dumps problems in his department on me and the other two Deputy Wardens.  I have counseled Plaintiff on his deficiencies as a supervisor and have assigned Deputy Warden Carroll to work with Plaintiff on these issues.  Notwithstanding these deficiencies, Deputy Warden DeWees received a satisfactory evaluation in 2002, and a 4% pay raise.

13.   Plaintiff's satisfactory overall rating and the recommendation that he receive a 4% pay increase were based solely on my evaluation of his job performance and for no other reason.

14.   In the 2002 pay for performance evaluation, I indicated that Deputy Warden Carroll exceeded expectations in the following areas:  job knowledge/skills; communication; initiative/problem solving; work habits; supervision/management; and in the overall rating.

4

15.    During the 2002 pay for performance evaluation of Deputy Warden Nichols, I rated her performance as exceeds expectations in the following areas:  job knowledge; work results; communication; initiative/problem solving; inter-personal relations; and in the overall rating.

16.    Both Deputy Warden Carroll and Deputy Warden Nichols supervise much larger work forces than the Plaintiff; had better results within their departments than did Plaintiff; they had both assumed added responsibilities; they both had responded to the facility during emergencies and/or extraordinary occurrence; assumed additional duties helping Deputy Warden DeWees; and the recommendation of a 6% increase was in recognition of their exemplary job performance.

17.    The Dauphin County Commissioners made the final determination as to the compensation that Deputy Wardens DeWees, Carroll and Nichols would receive in 2003.

18.    As a result of the 2002 pay for performance evaluation, I received a 5% pay raise from the County Commissioners, effective in 2003.

19.    Between 1997 and 2002, Deputy Wardens DeWees, Carroll and Nichols all received 4% pay raises as determined by the Salary Board and the Dauphin County Commissioners.

20.    In 1996, I had recommended two-step increases for all 3 of the Deputy Wardens.  I was not present at the Salary Board meeting which set the salaries.  My recommendation for a two-step increase for Deputy Wardens Carroll and Nichols was approved by the Salary Board.  Jay Braderman, the prison solicitor, Deputy Warden DeWees, and several others did not get the two-step increases that I had recommended but rather the County Commissioners/Salary Board approved one-step increases for those individuals.

21.    I did not have final decision making authority with respect to establishing non-union employee compensation in 1996.

22.    Deputy Warden DeWees is responsible for supervising the operation of the records office at the Dauphin County Prison.  During the past 8 to 9 years, there have been ongoing problems and complaints with respect to the operation of the records office.

23.    On the Friday of criminal court week in October, 2002, Plaintiff left work early at approximately 1:15 p.m., and neglected to advise anyone in the prison command structure that the records office would be closed at 2:00 p.m. that day, and it would not be staffed until the following Monday at 6:00 a.m.  Plaintiff made no other arrangements, and it was unknown what required paperwork was needed to be completed.

6

24.    Plaintiff had been advised several weeks prior to this incident to notify, at minimum, the shift commanders if he was going to be leaving early and/or that the records office would not be manned.  Plaintiff was also advised he needed to insure that required paperwork was completed before his departure and if not completed, to make other arrangements to insure its completion.

25.    While attending a conference in Erie County, I was notified that the records office was not staffed; that problems had occurred with commitments and releases of inmates that afternoon; and that Deputy Warden DeWees did not respond to repeated phone calls or pages from the shift commander and/or Major Stewart.  I was asked to try to contact him.  Deputy Warden DeWees did finally respond to a call from me and eventually reported back to the prison.  By the time Plaintiff arrived at the prison, a number of hours had elapsed and the situation was under control.

26.    I am unaware of any other occasion in which Plaintiff was contacted and directed to report back to duty at the prison.

27.    Since at least 1999, there has been a general hiring freeze imposed by the Dauphin County Commissioners.  As a result, in 2000, the prison was reduced by 23 employees and vacant positions could not be filled.  Although, in 2003, I have been able to convince the County Commissioners to hire ten individuals to fill vacant Correctional Officer positions and several key administrative and Treatment

7

positions, all other requests to fill positions have been denied and placed on hold pending a balanced budget.

28.    In my opinion, the Records Office has adequate staffing to perform its assigned duties.

29.    By way of history, the staff of the Records Office was increased from three to seven and this increase was done solely to staff the Records Office 16 hours per day, 7 days per week, with a minimum of two staff on duty.  Over the years, Deputy Warden DeWees has reduced the number of staff on duty to a minimum of one and has reduced the weekend coverage from 16 hours on Saturday and Sunday to 8 hours on Saturday and Sunday.  Currently, the Records Office is staffed only 12 hours per day, with at times only one person for 8 hours.  There is no coverage on Saturdays; and Sundays are on an as-needed basis, resulting in only a couple hours of Sunday work.  Any reduction of staffing of the Records Office since 2000 was through either resignation, attrition, or most notably due to the fact that Deputy Warden DeWees made no effort whatsoever to justify the need for filling any vacant positions in the Records Office while the countywide hiring freeze was in effect.

30.    The first position vacated within the Records Office occurred on April 26, 2000 and the involved individual sought a transfer within County government due to "being bored and not being busy."  This position was subsequently eliminated due to a lack of justification to request filling the position.

31.     There was a retirement on April 6, 2001 and this position is still being held vacant due to the hiring freeze within the County.  The second vacant position eliminated was due to a resignation on February 22, 2002.  As of this date, Deputy Warden DeWees has never requested nor justified the need to fill the vacant position.

32.     Deputy Wardens Carroll and Nichols have vacant positions within their areas of responsibility as a result of the hiring freeze.  To compensate for the reduced staffing levels, Deputy Wardens Carroll and Nichols have doubled up or modified assignments, cut programming, authorized overtime, and have had supervisors fill in to staff necessary positions.

33.     During the time the hiring freeze has been in effect, Deputy Wardens Carroll and Nichols have lobbied at administrative and other meetings with me to have the vacancies within their areas filled.  Deputy Warden DeWees, to this date, has not provided any justification, nor has he lobbied for the filling of any vacancies under his authority.

34.     County Commissioner Anthony Petrucci, the oversight Commissioner for the prison and the Chairman of the Prison Board, never advised me that he had received complaints from Deputy Warden DeWees.

35.   I had no knowledge that Deputy Warden DeWees had ever complained to Commissioner Petrucci concerning emoluments provided to prison administrators by outside vendors.

36.   I checked with the County Solicitor's office and was advised that there was nothing illegal or improper about outside vendors occasionally providing tickets to sporting events, occasional fruit baskets and/or small thank you gifts at the holidays for prison staff and/or administrators.

37.   Plaintiff would, at times, decline any such invitations.  On occasion, Plaintiff and his wife would accept meals, door prizes and/or gift bags sponsored by outside vendors in conjunction with the Wardens' Association's conferences. Plaintiff would also accept gifts from vendors such as candy and gift baskets and would redistribute them to other staff.

38.   I never received any complaints from Plaintiff regarding prison administrators' participation in golf leagues and/or with respect to any vendor entertainment or gifts.

39.   I have not participated in a golf league since October, 1999 when I underwent back surgery to correct a disk problem.  Prior to 1999, I was only in one golf league which was held on Tuesdays and the tee times were after 4:00 p.m. and not on County time.  A number of years prior to 1999, I did also golf in a Friday league for one year, but that league started after 5:00 p.m.  It is also important to

10

note that I am on call 7 days a week and 24 hours a day and routinely work additional hours on a regular basis.

40.   At no time did I request that Deputy Warden DeWees run a criminal background check on CO Savage, a former employee of the prison.  Mr. Savage died in 2001 and there was no reason to have a criminal background check run on him.

41.   In March, 2001, Deputy Warden DeWees gave a deposition in connection with a lawsuit filed by Christopher Lewis against the County and various prison officials.  Prior to that deposition, I advised Plaintiff to tell the truth, to answer the questions asked, and indicate whether any information he was providing was based upon hearsay or from second-hand sources.

42.   In his deposition in connection with the Lewis case, Deputy Warden DeWees testified that he had been interviewed by the FBI as part of an investigation into a complaint.  Prior to Deputy Warden DeWees' deposition, I was already aware of the fact that a complaint had been filed with the FBI as the FBI had made inquiry to me about that investigation and during previous depositions where those deposed discussed their meeting with the FBI.

43.   At the conclusion of his deposition in the Lewis lawsuit, Plaintiff apologized to me for not telling me about his interview with the FBI and indicated that the FBI had told him not to tell anyone.  The only thing I asked Mr. DeWees

was whether he told the FBI the truth.  So long as DeWees told the truth, I had no problem with this.

44.   Deputy Warden DeWees' testimony was favorable to the defense of the Lewis lawsuit.  I never engaged in any retaliation against Mr. DeWees for his deposition testimony in the Lewis case and/or for speaking with the FBI.  In fact, at the end of calendar year 2001, I gave Deputy Warden DeWees a satisfactory rating in his performance evaluation and he received a 4% pay increase effective in 2002.

45.   I have employed several managerial techniques over the years to encourage Deputy Warden DeWees to become a more productive supervisor.  All attempts to have Deputy Warden DeWees "rise to the occasion" have proved fruitless and at times when Plaintiff's demeanor and answers were non-responsive, I did raise my voice to get my point across.  These counseling and managerial growth sessions were always held in private and Deputy Warden DeWees was afforded great latitude in answering the identified deficiencies in his work performance.

46.   Over the years, Plaintiff has been non-responsive to emergency situations at the prison.  Over the course of years, Deputy Warden DeWees rarely, if at all, responded to an extraordinary incident outside of normal work hours.  In contrast, Deputy Wardens Carroll and Nichols routinely respond when notified of an extraordinary occurrence, even if they are not on duty at the time and even if the extraordinary occurrence is not within their area of responsibility.

47.     Over the years, due to Deputy Warden DeWees' incompetent recordkeeping, disciplinary actions including terminations of employees for excessive absenteeism have been overturned due to mistakes in the calculation of the disciplinary points accrued.   Deputy Warden DeWees is responsible for overseeing the administration of the disciplinary point system.   Also, suspensions have been revoked because employees were given the wrong violation and/or received the wrong points.   These problems have undermined the integrity of the points system and have necessitated the involvement of Deputy Warden Carroll and Major Stewart in double checking the information contained within the point system.

48.     Around the time of his deposition testimony in the Lewis case, Deputy Warden DeWees told me that a while back someone had told DeWees about an incident involving Dennis Stewart hitting an inmate.

49.     The only incident of which I was aware in which it was alleged that then Lieutenant Stewart struck an inmate occurred in 1991 and involved Stewart being struck by an inmate, breaking his glasses (without them he is legally blind) and being unable to see, defended himself to the best of his ability.

50.     Deputy Warden DeWees had no first-hand knowledge of this incident, was told to go back and obtain more information, but never did so.  Additionally, it is important to note that Stewart was not a party in the Lewis case and the incident

13

had occurred approximately ten years prior to DeWees' deposition in the Lewis case.

51.   I was never made aware of any complaint involving Stewart allegedly striking a prisoner tied down in a chair.  I was aware that a Deputy Warden was investigated for allegations of striking an inmate while in a restraint chair, but those allegations were investigated and were unfounded.

52.   At the time of his deposition in connection with the Lewis case, Deputy Warden DeWees testified as to two issues involving Lieutenant Hohney.  The first incident involved an allegation of Lieutenant Hohney striking an inmate.  An investigation was done to try to identify the Spanish inmate allegedly involved, but no matching inmate was found.  I believe that this incident was just locker room talk.

53.   Deputy Warden DeWees also testified in his deposition in the Lewis case regarding an incident in which Lieutenant Hohney yelled at an inmate in the lunchroom for spilling milk on him.  There was a mandatory duty to report allegations of mistreatment and/or abuse of inmates by staff, but Plaintiff did not report this incident to me.  Apparently, Deputy Warden DeWees didn't believe that the incident was serious enough to warrant a report.

54.   Some time around 1996, Deputy Warden DeWees did approach me stating that magazines were missing from the mailroom.  The only information

14

DeWees had was that the magazines were there one day and missing the next. I questioned Deputy Warden DeWees and asked him repeatedly for more information or proof that Deputy Warden Carroll was the culprit. Plaintiff had no proof; and no information other than Deputy Warden Carroll arrives prior to DeWees and has a key to the mailroom.

55. It is not uncommon that the prison receives notices that magazines have information regarding picking locks, bomb making, how to escape, and other areas which raise a security concern for the prison. Since Deputy Warden Carroll is in charge of security, he routinely reviews these publications to ensure that they do not contain any such information.

56. At no time have I retaliated against Deputy Warden DeWees for providing information against Deputy Warden Carroll, Major Stewart and/or Lieutenant Hohney.

57. At no time have I taken any adverse employment action against Deputy Warden DeWees. To the contrary, despite the noted deficiencies in his work performance, Deputy Warden DeWees had always received satisfactory employment evaluations and annual pay raises.

58. At no time relevant to Plaintiff's Complaint, has Deputy Warden DeWees ever been terminated from employment, suspended, demoted, transferred to another position, nor have his pay and/or benefits been decreased in any fashion.

59.    Deputy Warden DeWees has not been terminated from employment, nor has he resigned from employment.   To the contrary, Plaintiff continues to be employed at the prison as the Deputy Warden for Support Services.


Date:  10 Dec 03
_____

_____
Dominick DeRose
Warden
Dauphin County Prison

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES DEWEESE,               :
             Plaintiff        :    NO. 1:CV-03-490
                             :
    v.                       :
                             :    JUDGE RAMBO
WARDEN DOMINICK DEROSE        :
and DAUPHIN COUNTY,          :    JURY TRIAL DEMANDED
             Defendant        :

## UNSWORN DECLARATION OF
## DEPUTY WARDEN LEONARD CARROLL

I, Leonard Carroll, do hereby state under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following are true and correct based upon my own personal knowledge:

1.    I am currently employed as the Deputy Warden for Security at the Dauphin County Prison and have served in that capacity continuously since July 1992.

2.    As Deputy Warden of the Dauphin County Prison, my responsibilities include supervision of the security staff at the prison, including all Corrections Officers, Sergeants, Lieutenants, Captains and the Custody Major.  In 2002, I supervised approximately 216 employees.



3.      As Deputy Warden for Security, I have oversight of investigations of allegations of employee misconduct and allegations of criminal conduct made against inmates by the staff or allegations of criminal conduct made against staff by the inmates.   I also serve as the liaison between the prison and the Criminal Investigation Division of the Dauphin County District Attorney's Office with respect to investigation of criminal matters at the prison.

4.      As Deputy Warden for Security, I also oversee the training provided to the security staff and I am responsible for developing recommended policies and procedures at the prison.  Between 1993 and 1995, I drafted recommendations for re-writing every policy within the prison and was then responsible for implementing the policies and procedures which were adopted by the Prison Board.

5.      As Deputy Warden for Security, I receive the first call from the Shift Commander in the event of an extraordinary occurrence at the prison.  I always respond when needed to an extraordinary occurrence within the prison even if I am not on duty or not at the prison when contacted by the Shift Commander.

6.      I recall one occasion when I heard on the news that there was a problem with toxic fumes at the prison.  Even though I was on vacation at the time, I responded at the prison to assist with response to that extraordinary occurrence. When advised of the problem with the toxic fumes, Deputy Warden DeWees questioned whether he really needed to come in to the prison.  On several occasions,

Deputy Warden DeWees did not respond to calls regarding extraordinary occurrences, and usually claimed that either his pager and/or cell phone were not working properly.

7.     As Deputy Warden for Security at the prison, I approve or disapprove all background checks on employees, volunteers and/or contractors at the prison. I am also responsible for the issuance of all identification cards and updating the staff phone and address lists. I also monitor the inmate telephone system to assure no abuse or violations of the prison phone policy and respond to subpoenas for information regarding inmate conversations.

8.     Responsibility for oversight of inmate property is the responsibility of Deputy Warden DeWees. He frequently refers inquiries regarding inmate property to me to handle, even though such inquiries are not within my area of responsibility.

9.     I was first employed at the Dauphin County Prison on August 24, 1978. I was promoted to Sergeant in 1981 and made Lieutenant in 1983. I was then promoted to Captain in 1985 and was promoted to Custody Major in 1989 and served in that capacity until I was promoted to Deputy Warden for Security. I have been employed at the prison for a longer period of time than Deputy Warden DeWees and I have more experience as a supervisor.

10.    There have been ongoing problems and concerns regarding the operation of the Records Office at the Dauphin County Prison for the past eight to

3

nine years.  Deputy Warden DeWees is responsible for the supervision of the Records Office.  Due to the ongoing problems and concerns with the operation of the Records Office, Warden DeRose asked me to assist Deputy Warden DeWees with the Records Office.

11.    Based upon my personal observations, I believe that Deputy Warden DeWees lacks effective communication skills with subordinates and others; lacks hands on management within his areas of responsibility, particularly the Records Office; fails to effectively manage his own staff; and routinely dumps problems in his department on the Warden, Deputy Warden Nichols and/or myself.

12.    The Records Office completes all of the paperwork on all inmate intakes and releases.  Whenever the Records Office was not manned, the responsibility for processing intakes and/or releases fell to the Shift Commanders. A problem would arise in that Deputy Warden DeWees would leave work early without telling anyone and/or would fail to advise anyone in the prison command structure that the Records Office would not be staffed.  Deputy Warden DeWees would also fail to make other arrangements to ensure that any required paperwork was completed.

13.    In early October, 2002, Deputy Warden DeWees was counseled on this problem and was advised that the command staff must be notified whenever the

Records Office would not be staffed and that proper arrangements were to be made to ensure that required paperwork on intakes and/or releases would be completed.

14.     During Friday of criminal court week in October, 2002, Deputy Warden DeWees left the prison early and did not notify anyone in the command staff.  Additionally, Deputy Warden DeWees failed to notify anyone within the command staff that the Records Office would be closed at 2:00 p.m. that day and would not be staffed until the following Monday at 6:00 a.m.

15.     The Sheriff's bus arrived at the prison after the Records Office had closed and the responsibility for processing the intakes and releases fell to Captain Madden, the Shift Commander, and Major Stewart, as Plaintiff had failed to make other arrangements for processing the intakes and releases from court that afternoon.

16.     Problems occurred with commitments and releases that afternoon and Deputy Warden DeWees did not respond to repeated phone calls or pages from the Shift Commander.  Warden DeRose was attending a conference in Erie and was notified of the problem.

17.     Deputy Warden DeWees did finally respond to a call from Warden DeRose and eventually reported back to the prison.  A number of hours had elapsed, however, and the situation was under control when Deputy Warden DeWees finally arrived back at the prison.

18.     Deputy Warden DeWees is responsible for supervision of the disciplinary point system for employees at the prison.   Several problems have developed with the administration of the point system which has undermined the integrity of the disciplinary process.   Correctional Officers Shatto and Rampulla were fired for accumulating excessive points.  Grievances were filed and the prison had to admit to the mediator that mistakes had been made in the calculation of the accumulated points and the disciplinary actions had to be rescinded.  Officers were returned to work, at a monetary cost to the County.  Also, suspensions have been revoked because the employee was given the wrong violation and/or the wrong points.  Both I and Major Stewart double check the information on the accumulated points to ensure that the information is accurate before discipline is imposed.

19.     The prison received conflicting reports on whether a former employee named Savage had passed away.  I asked Deputy Warden DeWees to check with vital records to determine whether Mr. Savage had in fact passed away.  I did not request a background check on Mr. Savage and I do not ask Deputy Warden DeWees to do criminal background checks other than for legitimate, pre-employment purposes.

20.     I attend monthly administration meetings with the Warden and the two other Deputy Wardens.  I never recall Deputy Warden DeWees complaining at any of the meetings and/or at any other time that he was being retaliated against.

6

21.    During my tenure as Deputy Warden for Security, I have had a number of "intensive counseling sessions" with Warden DeRose arising out of disagreements with respect to operations within my area of responsibility in the prison which often times have resulted in yelling back and forth.  A prison is a stressful environment and it is not unusual that discussions among the administrators become heated during that give and take process.

22.    When questioned by Warden DeRose about operations and/or procedures within this area of responsibility during administrative meetings, Deputy Warden DeWees had a habit of not standing up for himself and did not engage in the give and take process with the Warden.  Additionally, once a decision had been reached on a particular issue, rather than supporting that decision as prison policy, Deputy Warden DeWees would indicate to subordinates that it was not his decision.  This undermines the chain of command at the prison and undermines the efficient operations at the prison.

23.    Since at least 1999, there has been a general hiring freeze imposed by the Dauphin County Commissioners.  As a result, I averaged 8 vacancies a month, but had at times as many as 13 vacancies within my area of responsibility in 2002; and an average of 9 vacancies a month, and as many as 15 vacancies this year.  To compensate for the reduced staff, I have cut or modified assignments, and authorized overtime.

7

24.     During the time that the hiring freeze has been in effect, I have lobbied at the administrative meetings held with Warden DeRose and the other Deputy Wardens to have the vacancies within my area filled.  To my recollection, Deputy Warden DeWees has never provided a justification to have any vacancies within his areas of responsibility filled during that time.

25.     Deputy Warden DeWees and his wife have attended meals sponsored by prison contractors, usually in connection with the Wardens' Association's conferences.  Deputy Warden DeWees has never complained to me that he thought that it was illegal or immoral for prison administrators to accept entertainment, meals or other small gifts from prison vendors.  In fact, Deputy Warden DeWees claimed door prizes at meals provided by prison contractors and had no problem accepting vendor gift bags at the Wardens' Association's conferences.

26.     It is not uncommon for the prison to receive information that magazines or other publications have information regarding picking locks, how to escape, bomb making and other topics of concern to security at the prison.  On behalf of the prison administration, I routinely review magazines and other publications received at the prison for security purposes.  I do not recall Deputy Warden DeWees ever raising any issue with respect to the review of inmate magazines.

Date: _12/10/2003_                                    _____

Leonard Carroll
Deputy Warden for Security
Dauphin County Prison

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES DEWEESE, | : | |
| Plaintiff | : | NO. 1:CV-03-490 |
| | : | |
| v. | : | |
| | : | JUDGE RAMBO |
| WARDEN DOMINICK DEROSE | : | |
| and DAUPHIN COUNTY, | : | JURY TRIAL DEMANDED |
| Defendant | : | |

## UNSWORN DECLARATION OF ELIZABETH NICHOLS

I, Elizabeth Nichols, do hereby state under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following are true and correct based upon my own personal knowledge:

1.    I am currently employed as the Deputy Warden of Treatment at the Dauphin County Prison.  I have served in that capacity continuously since July, 1992.

2.    I was initially hired as a County employee at the prison in March, 1982. Prior to that time, I was employed at the prison for approximately one year as an employee funded through the federal government's VISTA Program.  I had also previously served a two-year internship as a volunteer at the Lancaster County prison.

3.    As the Deputy Warden for Treatment, I supervise 44 employees, including part-time teachers and a chaplain who is an independent contractor.  My



area is divided into four sections and I have four supervisors who report directly to me.

4.    I am also responsible for oversight of the contract between the prison and PrimeCare Medical, Inc. to provide medical services to inmates housed within the prison.  The Dauphin County Prison has the largest treatment department of any of the county facilities in the south central Pennsylvania area.

5.    I am responsible for investigating complaints from inmates regarding employees within my area.  I am also responsible for maintaining the classification system within the prison and handle inquiries from inmates' family members.

6.    As Deputy Warden for Treatment, I receive the second call (after the call to Deputy Warden Carroll) from the Shift Commander, in the event of an extraordinary occurrence at the prison and routinely respond even when the extraordinary occurrence does not fall within my areas of responsibility.

7.    Since at least 1999, there has been a general hiring freeze imposed by the Dauphin County Commissioners.  As a result, I had seven vacancies within my area of responsibility in 2002 and six vacancies this year.  To compensate for the reduced staff, I have doubled up on assignments, such as counselors covering two cellblocks instead of one; cut programming; authorized overtime; and have had supervisors fill in to staff necessary positions.

8.     During the time that the hiring freeze has been in effect, I have lobbied at the administrative meetings held with Warden DeRose and the other Deputy Wardens to have the vacancies within my area filled.  To my recollection, Deputy Warden DeWees has never provided a justification to have any vacancies within his areas of responsibility filled.

9.     Over the last several years, I have received frequent requests from Deputy Warden DeWees for assistance on tasks and/or duties which fall within Deputy Warden DeWees' area of responsibility.

10.    Based upon my personal observations, I believe that Deputy Warden DeWees lacks hands on management within his areas of responsibility, particularly the records office, fails to effectively manage his own staff, and routinely dumps problems in his department on the Warden, Deputy Warden Carroll and/or myself.

11.    During my tenure as Deputy Warden for Treatment, I have had a number of "intensive counseling sessions" with Warden DeRose arising out of disagreements with respect to operations within my area of responsibility which often times have resulted in yelling back and forth.  I get yelled at by the Warden regularly at administrative meetings and chastised for one reason or another.  A prison is a stressful environment and with lives in the balance it is not unusual that discussions among the administrators become heated during that give and take process.

12.     When questioned by Warden DeRose about operations and/or procedures within his area of responsibility during administrative meetings, Deputy Warden DeWees had a habit of not standing up for himself and did not engage in the give and take process with the Warden.   Additionally, once a decision had been reached on a particular issue, rather than supporting that decision as prison policy, Deputy Warden DeWees would indicate to subordinates that it was not his decision. This undermines the chain of command at the prison and undermines the efficient operations at the prison.

13.     Deputy Warden DeWees and his wife have attended dinners sponsored by prison contractors, usually in connection with the Wardens' Association's conferences.


Date:  _12·16·03_____                          _Elizabeth Nichols_____
                                                Elizabeth Nichols
                                                Deputy Warden for Treatment at the
                                                Dauphin County Prison

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JAMES DEWEESE,             :
          Plaintiff        :     NO. 1:CV-03-490
                        :
     v.                    :
                        :     JUDGE RAMBO
WARDEN DOMINICK DEROSE  :
and DAUPHIN COUNTY,     :     JURY TRIAL DEMANDED
          Defendant    :

## UNSWORN DECLARATION OF DENNIS STEWART

I, Dennis Stewart, do hereby state under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following are true and correct based upon my own personal knowledge:

1.    I am currently employed as the Custody Major at the Dauphin County Prison and have served in that capacity since September, 1993. As the Custody Major, I am in charge of security and supervise all of the uniformed officers at the prison.

2.    Deputy Warden DeWees is responsible for the supervision of the Records Office. Over the past eight to nine years, there have been ongoing problems with respect to the management of the Records Office at the Dauphin



County Prison.  When the Records Office was not manned, then the responsibility for processing commitments and releases would fall to the Shift Commanders.

3.      During court week in October, 2002, Deputy Warden DeWees left work early at approximately 1:15 p.m. and neglected to advise anyone in the prison command structure that the Records Office would be closed at 2:00 p.m. that day and would not be staffed until the following Monday at 6:00 a.m.  Plaintiff made no other arrangements and it was unknown by either myself or Captain Madden, the Shift Commander, what paperwork was needed to be completed.

4.      Problems occurred with commitments and releases prior to 4:00 p.m. on that day and Deputy Warden DeWees did not respond to repeated phone calls or pages by the Shift Commander.

5.      Warden DeRose was attending a conference in Erie and was contacted to advise him of the problem in the Records Office and the fact that Deputy Warden DeWees did not respond to repeated phone calls or pages from the prison.

6.      Deputy Warden DeWees did finally respond to a call from Warden DeRose and eventually Deputy Warden DeWees reported back to the prison.  A number of hours had elapsed, however, from the time that we first attempted to contact Deputy Warden DeWees and the situation was under control by the time that Deputy Warden DeWees finally arrived back at the prison.

2

7.     This was not the first time that a problem had arisen with the processing of intakes and/or releases due to the fact that the Records Office was not manned and Deputy Warden DeWees had failed to advise anyone in the prison command structure that the Records Office would be closed and/or failed to make other arrangements for processing the required paperwork.

Date: _____12/10/03_____

_Major Dennis L. Stewart_
Dennis Stewart
Custody Major
Dauphin County Prison

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES DEWEESE, | : | |
| Plaintiff | : | NO. 1:CV-03-490 |
| | : | |
| v. | : | |
| | : | JUDGE RAMBO |
| WARDEN DOMINICK DEROSE | : | |
| and DAUPHIN COUNTY, | : | JURY TRIAL DEMANDED |
| Defendant | : | |

## UNSWORN DECLARATION OF MARK TEMPLETON

I, Mark Templeton, do hereby state under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following are true and correct based upon my own personal knowledge:

1.    I, Mark Templeton, am currently employed as the Director of Human Resources at the Dauphin County Prison.  I have been continuously employed in that position since May 14, 2001.

2.    I have reviewed the payroll records and salary history for Deputy Warden James DeWees, true and correct copies of those records are attached as Exhibit "1" and incorporated by reference.



3.     I have reviewed the Prison's payroll records with the salary history of Deputy Warden Leonard Carroll, a true and correct copy of those payroll records are attached as Exhibit "2" and incorporated by reference.

4.     I have reviewed the payroll records for the salary history of Deputy Warden Elizabeth Nichols, true and correct copies of those payroll records are attached as Exhibit "3" and incorporated by reference.

Date: _12/10/2003_

Mark Templeton,
Director of Human Resources
Dauphin County Prison

DEC - 5 2003

345.1793

Email

1          UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3            CASE NO. CV-03-490

4

5

6   JAMES DeWEES,              )

7          Plaintiff,         )

8                              )

9      -vs-                    )  CV-03-490

10                             )

11  WARDEN DOMINICK DeROSE     )

12  and DAUPHIN COUNTY,        )

13                             )

14          Defendants.        )

15

16

17          The Videotaped Deposition of

18  ANTHONY PETRUCCI transcribed from videotape by

19  Wanda Arakaki Leopold, CSR and Notary Public within

20  and for the County of Cook, State of Illinois from

21  a videotape tendered to me on November 25, 2003.

22

23

24



2

1            VIDEOGRAPHER:  Good morning.  Be advised

2    the video and audio are in operation.

3                  My name is Tony Marscisa.  My

4    address is 2219 Dixie Drive, York, Pennsylvania

5    17402.

6                  I've been contacted by P.R. Video to

7    be the video operator for this deposition.

8                  The case is in The United States

9    District Court for the Middle District of

10   Pennsylvania.

11                 It's titled James DeWees, plaintiff,

12   versus Warden Dominick DeRose and Dauphin County.

13                 It's a Civil Action Number

14   CV-02-490.

15                 The deposition is being held at the

16   Law Office of Mr. Don Bailey, 4311 North Sixth

17   Street, Harrisburg, Pennsylvania 17110.

18                 The video deposition is being taken

19   on behalf of the plaintiff, Mr. James DeWees.

20                 And the time is 10:57 a.m.  The date

21   is September 8, 2003.

22                 And would the witness please raise

23   your right hand and state for the record your full

24   name?

3

1          THE WITNESS:  My name is Anthony

2    Petrucci.

3          VIDEOGRAPHER:  And do you swear to tell

4    the truth, the whole truth, so help you God?

5          THE WITNESS:  I do.

6          VIDEOGRAPHER:  Thank you.

7              Mr. Bailey and Mr. Lavery, can I

8    have a sound check?

9          MR. BAILEY:  Yes.  My name is Don

10   Bailey.  I'm the attorney for plaintiff in this

11   matter, Mr. DeWees.

12              And my address is

13   4311 North Sixth Street, Harrisburg, Pennsylvania

14   17110, 717-221-9500.

15              Mr. Lavery?

16          MR. LAVERY:  Well, Frank Lavery

17   representing the defendant this morning.

18          MR. BAILEY:  Okay.  Thank you,

19   Mr. Lavery.

20              Mr. Petrucci, just a few

21   preliminaries.

22              First of all, Mr. Lavery, I assume

23   the usual stipulations.  Objections except as to

24    the form of the questions reserved until the time

4

1    of trial be acceptable?

2              MR. LAVERY:  That's fine.

3                   The witness will read and sign the

4    transcript.

5              MR. BAILEY:  Okay.

6              MR. LAVERY:  If there is one made.

7              MR. BAILEY:  Yeah, yeah, let me address

8    that because I have a letter given to me.

9                   P.R. Video, my wife owns and runs

10   P.R. Video, which is a -- they do video

11   depositions.

12                  Mr. Marscisa here is actually an

13   independent contractor, a Notary, and he does many

14   depositions for me.   (Inaudible.)

15                  We try to keep him on one case.

16                  Anyway, Mr. Lavery had raised some

17   questions that I think is important for him to put

18   on the record for your benefit so that you can make

19   a decision.

20                  Under the Rules, the -- we're doing

21   a deposition.  This is a video deposition.

22                  Under the Rules, it must be

23   conducted by a person authorized to administer

24   oaths, who is independent.

5

1              Mr. Marscisa meets those

2   qualifications.  He's a Notary, and he's a

3   videographer, and he conducts a video.

4              Now, if at any time, this video's

5   done, you or Mr. Lavery want to come up and want to

6   review the video, you can do that.

7              I know of no way to reassign the

8   video.   The Rules really don't provide for that.

9              And the way the Rules work, I am

10   supposed to, when I start (Inaudible) and I always

11   do, keep a copy of the video which I purchase, and

12   I keep the video in my office.

13              You have a right to come up and

14   review that video at any time.

15              You can take notes, et cetera,

16   whatever.

17              If you purchase a copy of that

18   video, at the same cost, or usually it's my

19   understanding from my wife, who is, believe it or

20   not, quite independent, runs her business quite

21   independently of me and makes her own money is

22    generally she sells a copy cheaper as a copy, and

23    that helps keep the costs down, not only for the

24    opposing counsel, opposing side, but for my

6

1     clients, okay?

2              Now, Mr. Lavery raised a question

3     that I think it behooves me to -- to explain, not

4     only for his benefit, but for you to make a

5     decision.

6              He can make -- Mr. Lavery can

7     purchase that video, and he can make a transcript

8     of the video.

9              If we had a transcript done of the

10    video, Mr. Marscisa, for example, can certify that

11    a copy of the video is a true and correct copy of

12    the videography that he conducted in the case.

13             He has -- P.R. Video keeps the

14    original.   That's their responsibility.

15             Anybody, believe it or not, can do a

16    copy of the transcript.

17             The video is always the master, is

18    the judge.

19             I just mention stenographic -- uh,

20    were simply there were transcription -- simply

21    because there's just -- they're just not accurate

22    enough.  (Inaudible.)

23              So you can actually do the

24    transcript in your own office of the video, if you

7

1     get the video.  The Rules provide that.

2              Even as an attorney, I can actually

3     do the video with an employee in my office, and I

4     can try doing it, if I wanted to.  And then do a

5     copy of the transcript.

6              Now it's not -- the Rules aren't

7     clear, but that transcript that's done, the only

8     time that ever has to be certified is -- is when

9     there's a stenographic interpretation.

10             In other words, a stenographer does

11    her notes, and then she certifies that's a true and

12    correct copy of what her stenographic notes

13    reflect.

14             The transcription from the video can

15    actually be done by an employee.  The video again

16    is the boss.  It's the guide, if there's a

17    conflict, you know.

18             But what I do, I insist as a result,

19    P.R. Video's practice is to have Notaries actually

20    do the transcription.

21              One young lady, for example,

22    transcribes Congress.  She transcribed court

23    systems.

24              And you know, when we do a

8

1    transcript, you know, we're -- I'm going to try to

2    work out with P.R. Video if I do the transcript, if

3    your attorney wants to come and look at it, you

4    want to come and review it, and let's say, compare

5    it to the video or whatever, I -- I think, I think

6    I should -- should allow that to happen.  I think

7    that's only fair, at least if that needs to be

8    done.

9              But if you're going to purchase

10   either the transcript or the video or both, like I

11   have to do, you have to do then, I think

12   Mr. Marscisa sends a letter of certification,

13   transcript certifying you're getting a certified

14   transcript under the Rules of a videotaped

15   deposition.

16              MR. LAVERY:  If you do make one, I think

17   the Rules for the transcription do apply because

18   you can mistranscribe a video as easily as you

19   mistranscribe your notes.

20              So the point is I think the same

21   Rule applies.  You're right.  You don't have to

22   make a transcript; I agree with you on that.  And

23   if you don't, I have no problem with that.

24              But when you do, and then that is

9

1    supposed to be the additional record of this, and

2    that's going to be used at trial, I do, however, I

3    do believe that the Rules apply with respect to the

4    transcription and certification.

5              MR. BAILEY:  Well, I don't, for the

6    simple --

7              MR. LAVERY:  (Inaudible)  disagreements.

8              MR. BAILEY: -- For the simple reason that

9    the video is the guide, and it is the authority.

10              If there is any -- what -- what the

11   County Board is supposed to do is confer in advance

12   about any conflicts, and then they're supposed to

13   be resolved.

14              The video is the guide to do that,

15   and the video is the authority to govern what is --

16   what is said.

17              And the point is if you don't have

18   to get -- the idea behind a stenographer who does

19   notes certifying that the -- her notes are correct

20   is because it's a phonetic jargon, if you will,

21   language, if you will, that's used to take down the

22   transcript.

23          And some of them actually, to be

24   very honest with you, they now, particularly in my

10

1   depositions, they all come in and do audio

2   recordings because they know they're more

3   accurate.

4          Then they go back, and they listen

5   and they double check because they're afraid of

6   being caught with an error.

7          So you know, I don't know that it's

8   a major issue.  I just wanted to -- wanted to raise

9   that.

10          And let you know if you want to

11   purchase a copy of either, and I do have a

12   transcript made of all videos.

13          I don't always do that, but

14   generally I do.

15          And when I do, I notify opposing

16   counsel.

17          You can work that out with P.R.

18   Video, okay?  And if you want a transcript, you can

19   get a copy of that transcript from them, and you

20   can come up and sit and read it and compare it to

21   the video -- not my video.

22          If you want to, I don't care.  But I

23   can't -- I cannot give you the work product of a

24   third-party contractor any more than I can give you

                                        11

1   a stenographic copy.

2          But anyway, we will get to that.

3

4                    EXAMINATION

5

6   BY MR. BAILEY:

7     Q.   Mr. Petrucci, I know that you've had the

8   -- you poor soul -- had the occasion to do another

9   deposition that I have conducted.  (Laughing.)

10         And as you know, I will try to keep

11  it brief, keep it to the point.  The key is to --

12  is to make sure you let me know if I -- maybe

13  you're in the middle of a thought or response.

14  Sometimes this happens.  I may inadvertently

15  interrupt you or speak over a response that you're

16   making.

17         Make sure you stop me.  Your

18   attorney, Mr. Lavery, is a very accomplished

19   attorney, and he usually catches me when I make an

20   error, but by the same token, no one really knows

21   what you're thinking.

22     A.   Okay.

23         MR. BAILEY:  So if you have a problem,

24   you catch it, okay?

                                            12

1          Now, the other thing, I don't mind

2    doing this, if you have a question of where one's

3    -- or those of Mr. Lavery also with a series of

4    questions or particular question, you're not sure

5    about the meaning, please feel free to ask me.

6          I don't mind being questioned.  I'm

7    interested in an accurate response.  And I want to

8    make sure you understand the premise of my

9    question.  Okay?  So please feel free to do that.

10         The other thing is keep your voice

11   up.  There's a little bit of an air conditioner

12   hum, and it will help if you speak up.

13         Thank you for being patient with

14   that other area.  Mr. Frank and I have, you know,

15   we've communicated on that, having P.R. Video.

16   (Inaudible.)

17            I wanted to respond to that.  We can

18   go ahead now.

19            Frank, do you have anything you want

20   to put on the record?

21            MR. LAVERY:  No.  My point position it's

22   important not to mutter around, not to clutter up

23   the record any more with that.  We will try to work

24   it out, and if it doesn't work out, the judge will

13

1    work it out.  (Inaudible.)

2    BY MR. BAILEY:

3        Q.   Mr. Petrucci, thank you very much.  We're

4    ready to begin.

5            Will you please state your full name

6    for the record and how you are employed at the

7    present time?

8        A.   My name is Anthony N. Petrucci, and I'm

9    employed as the Dauphin County Commissioner, and

10   also as a professor at the Harrisburg Area

11   Community College.

12       Q.   Okay.  And Mr. Petrucci, for the record,

13    and because somebody, you know, will be

14    transcribing this, spell your last name.  I know

15    it's a good --

16        A.    Yeah.

17        Q.  -- Solid Italian name, but -- and they're

18    easy to variate in spelling.  But just for the sake

19    of the record, if you can spell it.

20        A.    Petrucci, P-e-t-r-u-c-c-i.

21        Q.    Thank you, sir.

22              Mr. Petrucci, how long have you been

23    a Dauphin County Commissioner?

24        A.    I'm in my third term.  Eleven years.

14

1        Q.    Okay.  And the Parent Board is composed

2    of -- I understand you're a Democrat; is that

3    correct?

4        A.    Yes.

5        Q.    And the current Board is composed of

6    obviously Upper Pennsylvania's governmental

7    structure, there are two Majority Commissioners,

8    Republican Commissioners.  Who are they?

9        A.    They are currently Jeff Gace and Loman

10    Henry.

11        Q.    Okay.  And -- and the -- do you -- do you

12    have committees?  Does the -- does your current

13    set-up, organizational set-up -- strike that.

14                   Is it a current work practice for

15    the County Commissioners involved in Dauphin County

16    to have various committees -- strike that.

17        A.    Not committees.

18        Q.    Yes, sir.  That was a poorly phrased

19    question.

20                   As Dauphin County Commissioners are

21    organized, do you have various Boards?

22        A.    Yes.  We have the practice of assigning

23    oversight responsibilities to particular

24    Commissioners.

                                                15

1                    The Republican Majority

2     Commissioners usually get together and decide what

3     they want to do, and whatever's left over, they

4     turn it to the Minority Commissioner.

5                    And for all eleven years of my

6     Minority Commissionership, I have been in the

7     minority, and have accepted responsibility for

8     oversight for those departments that I have been

9     allowed to oversee.

10        Q.    And is one of the Boards a Prison Board?

11      A.   Yes, that is a position that generally is

12   given to the Minority Commissioner, although not

13   always.

14           That was offered to me, and I have

15   been voted every year by the Prison Board to be the

16   Prison Board Chairman.

17      Q.   Have you been Chairman of the Prison

18   Board for, let's say, through the last election

19   cycle, the last --

20      A.   Yes.

21      Q.   -- The last four years or four odd years?

22   I guess, it's three years?  Two years?

23      A.   Yeah.

24      Q.   Okay.  Now, who else serves on that

16

1   Board?

2      A.   The Board is comprised of the three

3   Commissioners, the Sheriff, the DA, Controller, and

4   an Appointee of the President Judge.

5      Q.   And who's the person that the President

6   Judge says?

7      A.   Judge John Cherry is currently serving as

8   the proxy for the President Judge.

9      Q.   And Mr. Cherry was previously the

10    District Attorney of Dauphin County?

11        A.   Yes.

12        Q.   Who is the current District Attorney of

13    Dauphin County?

14        A.   Ed Marsico.

15        Q.   Mr. Ed Marsico.

16                 How often does the Prison Board

17    meet?

18        A.   Once a month.

19        Q.   And where does it meet?

20        A.   At the prison.

21        Q.   Are there minutes and records kept of

22    those meetings?

23        A.   Yes.

24        Q.   Now, in this lawsuit, Mr. DeWees has

17

1    named Warden Dominick DeRose.

2                 Are you familiar at all with the

3    Amended Complaint?  Have you had an opportunity to

4    review it?

5        A.   I have had discussions with my attorney

6    in regard to the nature of them.  I haven't read

7    the nature of them.

8        Q.   I'm going to ask that we suspend, and

9      give you a copy of the Amended Complaint.

10                  And I would like you to just -- it

11     won't take -- it's not going to take long,

12     (Inaudible).

13          A.   Uh-huh.

14          Q.   Okay.  And ask you to just --

15     (Inaudible.)

16          A.   Okay.

17          Q.   But I would like you to just look through

18     it, okay?

19          A.   Okay.

20          MR. BAILEY:  Can we suspend?

21          VIDEOGRAPHER:  The time is 11:12 a.m.

22     The date is September 8, 2003.  We're suspending.

23                  (Recess taken.)

24          VIDEOGRAPHER:  The tape recorder's back

                                                18

1      on.  The time is eleven -- the time is 11:19.  The

2      date is September 8, 2003.

3                  We're resuming the deposition of

4      Commissioner Petrucci.

5      BY MR. BAILEY:

6          Q.   Okay.  Commissioner, have you had a

7      chance to look over the Amended Complaint?

8       A.   Yes, I have.

9       Q.   Okay.  I'm going to leave for convenience

10   -- this is a filed copy -- there for you.

11       A.   Okay.

12       Q.   If you need to refer to it or want to,

13   I'm not going to really refer to it specifically

14   now, but I will comment on it at an appropriate

15   time.

16            When did you first learn that this

17   Complaint had been filed?

18       A.   I am not certain.

19            Several months ago, weeks ago.

20       Q.   And the date stamp on it is April 22,

21   2003, right?

22       A.   Uh-huh.

23       Q.   How did it come to your attention?

24       A.   It came to me by mail.

19

1       Q.   And did you discuss that Complaint with

2   -- now, bear in mind when I ask you questions, if

3   you have a discussion where there are just you and

4   your attorney, and not any third person, then those

5   are privileged conversations, and you do not have

6   to reveal.

```
 7              Your attorney will keep a close eye

 8   on that.  Just so you don't blurt anything out, I

 9   wanted to make sure you know that, okay?

10       A.   Okay.

11       Q.   All right.  Now aside from your lawyer or

12   any lawyer you may have spoken to about this legal

13   opinion purposes or discussion purposes, did you

14   discuss this Complaint with anyone after you got it

15   in the mail?

16       A.   No.

17       Q.   Did you discuss it with Mr. DeRose?

18       A.   No.

19       Q.   When you got the Complaint in the mail,

20   did you look it over?  Did you read it?

21       A.   No.

22       Q.   All right.  What did you do with it?

23       A.   I waited for my attorney to contact me.

24       Q.   Okay.
```

                                               20

```
 1       A.   I pretty much knew that it was -- I just

 2   briefed, you know, like a couple of minutes, said

 3   okay, and I figured that he would get a hold of me.

 4       Q.   Okay.  And the -- did you ever have any

 5   discussions with James DeWees about the -- DeWees
```

6      about the contents of the Amended Complaint?

7                  Be careful with this question, to

8      make sure -- (Inaudible.)

9                  You did not discuss the Complaint,

10     per se, the Complaint, itself, with Mr. DeWees; is

11     that correct?

12        A.    That is correct.

13        Q.    All right.  Now, he makes certain

14     allegations about discussions that he had with you

15     about prison policy and/or prison occurrences over

16     the years; is that correct?

17        A.    Uh-huh.

18        Q.    All right.  I want you to go back, and I

19     want to try to revisit with you, if I can, any

20     conversations that you had with Deputy Warden

21     DeWees about what happened at the -- at the

22     prison.

23                  MR. LAVERY:  I'll object to the form of

24     the question.   I think it's overbroad.

                                                    21

1                  MR. BAILEY:  I'm going to be specific.

2                  MR. LAVERY:  Okay.  Fine.   As far as

3      that.

4                  MR. BAILEY:  Yeah.

5          MR. LAVERY:  There are specific

6   allegations, and I think it would be more fair if

7   you asked when he discussed those with Mr. DeWees.

8          MR. BAILEY:  Yeah, I'm going to do that,

9   but I am going to ask you what discussions you had

10  with him of a different nature also, which I have

11  done some research on.

12  BY MR. BAILEY:

13     Q.   Did -- did Jim DeWees ever talk with you

14  about what was happening out at the prison?

15         MR. LAVERY:  I'll object to the form of

16  the question, the vague nature of the question.

17  (Inaudible.)

18          You can answer if you understand.

19  BY MR. BAILEY:

20     Q.   Did you get that message?

21     A.   I've had discussions with Jim.

22     Q.   Of course.

23          And did Mr. DeWees ever discuss with

24  you happenings or concerns about how mail was

                                                    22

1   handled in prison?

2      A.   I'm not recalling any specific comments

3    in regard to mail.

4         Q.   Did he have any discussions with you

5    regarding magazines or things that prisoners may

6    have received in prison?

7         A.   I read that issue here in this file, and

8    I do recall some conversation, some mention of it,

9    but I can't tell you when, or I couldn't even tell

10   you who.

11        Q.   Okay.  When you say when or who, would

12   that mean you remember discussing something of that

13   sort --

14        A.   Yeah.

15        Q.   With Mr. -- Mr. DeWees?  (Inaudible.)

16   Oh, I'm sorry.

17        A.   I'm not even sure that it was Mr. DeWees

18   that raised the issue with me.

19        Q.   Oh.

20        A.   I have conversations with quite a few

21   people in prison --

22        Q.   Yeah.

23        A.   -- In regard to prison issues.

24             And it would be difficult for me to

                                                    23

1    pinpoint now who raised that issue with me.

2        Q.   Okay.  One second.  Now --

3             MR. LAVERY:  Just so we're clear on the

4    record what we're talking about, the issue of

5    allegedly girlie or pornographic magazines being

6    sent in the mail; is that what you're talking

7    about?

8             MR. BAILEY:  Well, I asked about mail,

9    and here's what I would like to do.  I want to go

10   back through there and really get specific on

11   (Inaudible) --

12            MR. LAVERY:  I understand.  But he

13   referenced something that he said he saw in there.

14            MR. BAILEY:  Okay.  Let me -- let me --

15            MR. LAVERY:  I mean, and I think that

16   needs to be --

17            MR. BAILEY:  Let me help your attorney.

18   I think he raises a good question.  He wants to

19   clarify -- your attorney wants to clarify your

20   response.

21                 I don't know if it's fair to make

22   him wait until his turn.  Let's get the record

23   clear right now.

24   BY MR. BAILEY:

24

1        Q.   When you had responded to my question,

2   which was not specifically directed to the

3   Complaint --

4                  Frank, do you have that section for

5   us?

6                  -- Were you referring to this

7   section?  Go ahead.

8              MR. LAVERY:  13-C.

9              MR. BAILEY:  Okay.  And I will read it

10  real quick.

11             MR. LAVERY:  Okay.

12  BY MR. BAILEY:

13       Q.  "Deputy Warden DeWees reported to Warden

14  DeRose about the practice of absconding with" --

15  let me see if I have the right term, yes --"of

16  absconding with prisoners' mail by Deputy Warden

17  Frank Carroll.  More specifically, Mr. Carroll

18  periodically takes prisoners' magazines,

19  particularly girlie or pornographic magazines, and

20  often keeps them, many times causing the prisoner

21  to have to pay for it.  When DeWees complained of

22  this to Warden DeRose, he was annoyed and upset

23  with Deputy Warden DeWees for reporting the

24  unlawful conduct and covered for Mr. Carroll, even

1    though what Carroll does and did is a violation of

2    both Federal and State law."

3                    Now, this occurred during 2000, 2003

4    and before.

5                    My question to you is:  Did Mr.  --

6    and I think you already answered it.

7                    Is it fair to say you have no

8    specific recollection of whether Mr. DeWees ever

9    talked to you about difficulties with mail and

10   magazines, prisoners' magazines at the prison is my

11   question; is that correct?

12       A.   That's correct.  I do not recall

13   specifically any comments about that.

14                   I recall generally that there was an

15   issue raised, but I couldn't tell you who raised it

16   with me.

17       Q.   Okay.  Now, do you remember if the issue

18   of where you might have been when the issue was

19   raised?

20       A.   I couldn't even recall that.  It could

21   have been in my office.  It could have been in

22   prison.  I don't recall.

23       Q.   Has Mr. DeWees ever come down to see you

24   at your office?

1       A.   Yes.

2       Q.   Do you know whether he has ever come down

3   to see you at your office without Warden DeRose's

4   knowledge?

5       A.   I don't know.

6       Q.   So if Mr. DeWees has come down to your

7   office, but you would have no way of knowing

8   whether he did so without the warden's permission

9   or knowledge, or whether the warden knew he was

10   there?

11       A.   No.

12       Q.   And you never querried him about that

13   action?

14       A.   No.

15       Q.   Did Deputy Warden DeWees ever ask you to

16   keep things which he communicated to you in

17   confidence?

18       A.   I don't know that he asked for that, but

19   I did.

20       Q.   All right.  What did he raise with you,

21   or what did he communicate to you that you felt

22   should be kept in confidence?

23       A.   There were issues raised that he felt

24   that he was being retaliated against for reporting

1    some inmate -- not inmate, but correctional

2    officers' problems.

3              He seemed to be a magnet for, a

4    release valve for some of the employees of the

5    prison to complain to.

6              And he relayed some of those

7    complaints to me, and he also mentioned that he

8    felt that because of that, he was somewhat less

9    trusted and perhaps retaliated against.

10             And so for fear of causing him any

11   more harm, I preferred to look at the allegations

12   of the inmates and the guards, not really

13   specifically mentioned to the Warden any

14   conversations that I had with Jim.

15   Q.    Excuse me.   (Coughing.)

16             Did Mr.  -- did Mr. DeWees ever

17   complain to you or ever communicate -- strike

18   that.

19             Did Mr. DeWees ever communicate

20   concerns about the physical abuse or beating of

21   prisoners?

22             MR. LAVERY:   I'm going to object.

23             Are you asking him whether

24   Mr. DeWees communicated things to Mr. DeWees said

1    he saw or was concerned about what he saw?  I think

2    you need to --

3              MR. BAILEY:  Okay.

4              MR. LAVERY:  You need to make a record

5    here as to (Inaudible.) --

6              MR. BAILEY:  Well, you can do that, and

7    I'm doing that.  I'm going to go ahead and ask the

8    question.

9              MR. LAVERY:  I'm just going to object.

10             MR. BAILEY:  Sure.

11             MR. LAVERY:  Because I think the question

12   is vague.  Also -- (Inaudible.)

13                  You may answer the question.

14             MR. BAILEY:  Sure.  I'm sorry.

15   BY MR. BAILEY:

16       Q.   Did Mr. DeWees ever communicate to you

17   concerns that he had or had been relaying to him

18   about the treatment of prisoners by guards and

19   police inmates?

20             MR. LAVERY:  (Inaudible.)  Are you

21   talking specifically about DeWees on things he may

22   have heard generally, as far as -- (Inaudible.)

23             MR. BAILEY:  (Inaudible.)  Anything.  Go

24   ahead.

29

1            Let me go back.  Please let me ask

2    my question.

3            You're a very accomplished and

4    bright gentleman.  You probably have a higher IQ

5    than I will ever have.

6            I would just like to -- I think you

7    can understand these questions.  They're fairly

8    simple.  I want to make sure we're clear.  They

9    won't be difficult in the record.

10            Let me rephrase it.  I think

11    counsel's overdoing it, but that's all right.  Let

12    me rephrase.

13    BY MR. BAILEY:

14    Q.  Very simple question:  Did Mr. DeWees

15    ever indicate that he or others at the prison had

16    concerns about the abuse, physical abuse of

17    prisoners?

18    A.  I have had so many conversations with so

19    many people about so many issues in the prison that

20    it is difficult to recall specifically who said

21    what to me about what.

22            I do recall conversations about

23    certain inmates receiving trouble.

24                    I recall the chair and ankle

                                                        30

1    incident where the guard stepped on an ankle.

2                    Who relayed those to me, and it

3    might have been multiple people that relayed the

4    same thing to me, I cannot recall.

5         Q.   Okay.  But as you sit here today, you

6    have no specific recollection of Deputy Warden

7    DeWees being one of the persons who may have?

8         A.   He may have, and again, it may have been

9    someone else.

10        Q.   Okay.  Do you have a recollection of -- I

11   understand that you told us that Mr. DeWees

12   expressed concern that he was being retaliated

13   against?

14        A.   Yes.

15        Q.   Because he was a safety valve, as it

16   were, someone to whom persons in the prison could

17   complain, and he felt he might be mistreated.

18                    Did he ever indicate who he felt may

19   be retaliating against him specifically?

20                    Did he indicate that Warden DeRose

21   may be retaliating against him?

22        A.   I sensed from our discussion in regard to

23    that issue that he felt there was a clique of the

24    Warden and the Deputy Warden Carroll and it may

31

1    have included others in conversation.

2                    But basically the top leadership,

3    and that was basically it.

4    Q.   Yes, sir.  Commissioner Petrucci, do you

5    remember when the last time -- I know this is a

6    very difficult question, but try to think, if you

7    can.

8                    Do you remember, did Mr. DeWees

9    complain to you or communicate with you about these

10   matters of concern, you know, within the last year

11   or two years before the lawsuit was filed?

12   A.   I cannot recall when our conversations

13   were.

14                   I know Jim and I talked a great deal

15   in the early years, and then for awhile, we didn't

16   have much chance for communication.

17                   So I can't really tell you that.

18   Q.   Okay, sir.  Commissioner Petrucci, did

19   Mr. DeWees ever complain to you about his pay? That

20   he was being treated differently with pay?

21   A.   I remember the pay issue, but I am not

22    sure if Jim brought it up or if I detected it on my

23    own.

24                    But I did see, and in one of the

32

1     budget years, and I'm not even sure which one, that

2     the two Deputy Wardens had one kind of a salary

3     increase, and Jim had another.

4                    And I recall asking the Warden about

5     that pay differential.

6                    And the Warden indicated to me that

7     it was a matter of performance review, and that

8     that was the basis for the -- for the difference.

9         Q.   Do you have a recollection of whether

10    Mr. DeWees ever complained to you about problems at

11    the prison with allegations made against the

12    chaplain?

13        A.   I recall nothing about allegations

14    against the chaplain.

15        Q.   Were there any allegations that

16    Mr. DeWees may have shared with you, if -- if you

17    remember, (coughing) about female prisoners being

18    sexually abused by, more specifically

19    Chaplain Favoure, Lieutenant Honney, or any other

20    officials at the prisoners that they were used

21    sexually by those people?

22         A.   I do not recall any conversations along

23    those lines.

24         Q.   Did you have -- ever have any

33

1     conversations with Warden DeRose about the sexual

2     abuse of female prisoners in the Hatfield Prison?

3          MR. LAVERY:  I'll object to the form of

4     the question as it lacks foundation that there were

5     any such complaints of any such knowledge, but he

6     can answer.

7          MR. BAILEY:  You can answer.

8          THE WITNESS:  I don't recall having any

9     conversations like that with the Warden or Deputy

10    Warden DeWees.

11    BY MR. BAILEY:

12         Q.   What about Deputy Warden Nichols,

13    Elizabeth Nichols?

14         A.   No.

15         Q.   Do you ever have a recollection of Deputy

16    Warden DeWees or any other high official at the

17    prison bringing to your attention the female

18    prisoners who had gotten pregnant by any

19    individuals at the prison?

20       A.   I do recall having learned of a pregnancy

21   in the prison.

22                  I couldn't tell you how I learned of

23   the issue.

24       Q.   Do you have a recollection of ever

34

1   learning or becoming aware that that pregnancy

2   originated in the prison as a result of a sexual

3   activity within the prison?

4       A.   That was my initial comment back to the

5   person who related it to me, that that was the

6   nature of the discussion, whoever it was with, that

7   this person had gotten pregnant in prison.

8       Q.   Was there ever any information related to

9   you specifically?

10                  Did -- Did Deputy Warden DeWees

11   relayed any of -- DeWees relay -- relay any of that

12   information to you, if you can remember?

13       A.   I do not recall.

14       Q.   Did Deputy Warden DeWees ever indicate to

15   you that he had concerns about the abuse of a,

16   (inaudible) you know, contractors at the prison?

17       A.   I do recall Jim mentioning that to me.

18       Q.   And Mr. Petrucci, what did Mr. DeWees

19   say?

20        A.   He had mentioned that some of the

21   administration, I think the Warden and I think a

22   couple of others were playing golf.

23        Q.   Did he ever indicate anything about --

24   strike that.

35

1             Did he ever relay anything about

2   abuses or alleged abuses of charities of the

3   Warden's efforts on behalf of, perhaps very

4   reputable charities, but that employees or prison

5   facilities and supplies were being -- (inaudible)?

6        A.   I'm not aware of any discussions along

7   that line.

8        Q.   Okay.  Did Mr. DeWees ever pass on to you

9   information indicating that he had been approached

10   by the FBI and spoken with the FBI about alleged

11   abuses in the prison?

12        A.   No.

13        Q.   Did Mr. DeWees ever complain to you that

14   he feared retaliation because he was forced to

15   divulge that he had spoken to the FBI or the law

16   enforcement officials?

17        A.   I do not recall.

18        Q.   Did Mr. DeWees ever come to you and

19    complain about what -- what he felt or he alleged

20    was an abuse of prison resources, like computer

21    resources or criminal searches, that kind of thing?

22             MR. LAVERY:   I'll object to the form of

23    the question.   It's vague, but you can answer it.

24             THE WITNESS:   I have difficulty answering

                                                    36

1     that because Jim has come -- we have had

2     conversations.

3                  The detail of them has often been a

4     problem for me because -- well, it just wasn't

5     substantive detail to follow up on.

6                  I mean, so I just don't -- I just

7     don't recall specifically the stuff.

8                  I remember general conversations,

9     raising a few issues.

10                 I don't recall the FBI, and I don't

11    recall the -- the last thing you mentioned there,

12    the contractors, Subsidiaries and contractors, I

13    don't recall anything along those lines.

14    BY MR. BAILEY:

15        Q.   Did -- did Mr. DeWees ever indicate to

16    you that the Warden had suggested to Mr. DeWees

17    should take advantage of any (inaudible) you know,

18    gratuities or (inaudible) whatever offered by

19    contractors to the County for the prison and

20    baseball tickets, free entertainment deals, that

21    kind of thing?

22        A.   I do not recall any conversations along

23    those lines.

24        Q.   Now, let me -- I'm going to change

                                                    37


1    directions now, and I want to ask you questions

2    about things that you may have said to -- to Warden

3    -- Deputy Warden DeWees in return -- response

4    during a conversation.

5              Did you ever indicate to Deputy

6    Warden DeWees that Mr. DeRose was doing -- was --

7    was mishandling or doing things wrong, mishandling

8    things in the prison or doing things wrong?

9              MR. LAVERY:  I'll object to the form of

10   the question.  The question is vague in nature.

11   It's overly broad.

12             You may answer it.

13             THE WITNESS:  I may have had discussions

14   with Jim in regard to the Warden.

15             My concern about the Warden is that

16    he tries to do everything himself.  He's not a good

17    delegator.

18                But other than that, I can't recall

19    any discussions at all with Jim about the Warden.

20    BY MR. BAILEY:

21        Q.   Did you ever indicate to Mr. DeWees that

22    one of the problems that -- that you encountered

23    dealing with the prison was that the Majority

24    Commissioners made decisions, and in some ways you

38

1    are not able to effect those decisions?

2        A.   Yes.

3        Q.   Did you ever indicate to Mr. DeWees that

4    Warden DeRose communicated with the Majority

5    Commissioners, and that in many ways, you were

6    outside of that communication?

7        A.   Yes.

8        Q.   Did Warden DeRose ever indicate to you

9    that Mr. DeWees' concerns about the pay

10    differential -- well, strike that.

11                Your testimony was that you don't

12    remember if that came from Mr. DeWees or yourself.

13    Let me rephrase the question.

14                Did Warden DeRose ever indicate that

15    the pay differential that was -- that he'd

16    indicated was based upon job performance in

17    comparison to the Deputy Wardens, did Mr. DeRose

18    ever indicate that that was a decision made by the

19    Commissioners or -- and use the words "downtown" as

20    opposed to -- as opposed to it being his decision?

21              Do you understand that question?

22    A.    Yes, I do understand that.

23    Q.    Okay.

24    A.    And I don't recall that that was

39

1     mentioned that it was his decision or somebody

2     else's decision.

3     Q.    So Deputy Warden DeWees would be in error

4     if -- if he had -- if he's alleged -- let me read

5     Paragraph 23 for you.

6              "When plaintiff asked DeRose why he

7     was being denied the normal pay increases awarded

8     to others, DeRose replied that the County

9     Commissioners" -- there should be an "S" on that,

10    commissioners --  has made -- "had made the

11    decision, and that something had (quote) 'happened

12    Downtown.' Mr. DeWees alleges this was false."

13              I want to ask some questions about

14    that.

15              In other words, your testimony is

16    that when Warden DeRose told you that there had

17    been a decision made based upon obviously the

18    implication being the lack of imperative job

19    performance by Mr. DeWees, that a decision, a

20    management decision had been made not to increase

21    him as much as the other Deputy Warden, correct?

22        A.    Yes.

23        Q.    Okay.

24        A.    And who makes that decision, I don't

                                                    40

1    know.

2        Q.    That's what I want to go to next.

3              Now, when you asked -- when you

4    raised this issue, the issue of the pay

5    differential with Warden DeRose, your testimony is

6    that he didn't indicate this wasn't my decision or

7    out of my hands; this was somebody else who made

8    this decision?

9        A.    There was no indication who made the

10    decision there, but I presumed --

11        Q.    Yes?

12        A.    -- That largely it would have been the

13   Warden who is the evaluator.

14       Q.   Yes.

15       A.   And all of the Commissioners who are also

16   Prison Board members, and who have the knowledge,

17   of course.   (Inaudible.)

18       Q.   So as you sit here today, you don't know

19   if this decision was made by the Majority

20   Commissioners -- you know it wasn't made by you?

21       A.   That's right.

22       Q.   You don't know whether it was made by the

23   Majority Commissioners after consultation --

24   consultation with Warden DeRose or simply their

41

1    approving Warden DeRose's recommendations; you

2    don't know that?

3           MR. LAVERY:   Object to the form of the

4    question.

5           THE WITNESS:   No.

6               I'm sorry.

7           MR. BAILEY:   That's okay.   He answered.

8           MR. LAVERY:   I've got to put the formal

9    objection on the record, but you can answer the

10   question unless I tell you not to, which I doubt

11    I'll tell you.

12         THE WITNESS:  So there was no discussion

13    in regard to that.

14    BY MR. BAILEY:

15         Q.   Okay.  So -- so as you sit here today,

16    you don't know who made that decision, but based on

17    your experience, you presume that it was either a

18    decision or a recommendation of Warden DeRose?

19         A.   I presumed that both of them, the Warden

20    and the Majority Commissioners made the decision.

21              How, who, and what, I don't -- I

22    don't know.

23         Q.   So you're not in that league?

24         A.   I'm not in there.

                                                    42

1              Minority Commissioner's a permanent

2    lame duck position.

3         Q.   Okay.  In Paragraph 24, Mr. DeWees,

4    alleges as follows:  "The plaintiff, Mr. DeWees,,

5    he's alleging that he went to Mr. Petrucci and

6    asked him why he was denied the normal increase in

7    pay afforded others.  Mr. Petrucci told him that

8    County Commissioners had delegated that authority

9    to Warden DeRose, and he made those decisions."

10              Your testimony here today is that

11   you're out of that loop, and obviously you did not

12    -- you did not express that opinion to

13   Mr. DeWees; is that correct, Mr. Petrucci?

14        A.    That's true.

15              VIDEOGRAPHER: The time is 11:50 a.m.

16              MR. BAILEY:   Okay.  11:50 a.m.   Thank

17   you, Mr. Marscisa.

18   BY MR. BAILEY:

19        Q.    Let me go -- take a look at Paragraph 24

20   there.  Obviously based upon your testimony --

21   well, strike that.

22                  Can you expound on Paragraph 24 to

23   the extent of its accuracies or inaccuracies?

24   (Inaudible.)

43

1              MR. LAVERY:  Well, I'm just going to

2   object.  It's something that he says he really

3   doesn't know.  (Inaudible.)

4              THE WITNESS:  That would be my answer to

5   this.  I'm not sure how the decision gets made in

6   regards to the pay, but it wasn't me.

7   BY MR. BAILEY:

8        Q.    Okay.  Do you know whether -- strike

9    that.

10            In previous testimony today, you've

11   indicated that Mr. DeWees had complained to you

12   that he -- he at least believed that he was

13   suffering retaliation because he was reporting

14   information out of the prison; is that correct?

15       A.   Yes.

16       Q.   All right.  Did you ever -- did you ever

17   investigate, or were you ever able to learn whether

18   his complaints had some validity based on your own?

19       A.   I did no special investigation of that

20   allegation.  It would be pretty hard to do.

21            We did also talk about how to

22   alleviate that situation, which would be to find a

23   job someplace else.

24            And I did contemplate how to get Jim

44

1    into some other position.

2            We opened up a work release.

3    Thought about trying to get that opened and fair.

4    I did.

5            But again, as Minority Commissioner,

6    I don't get to call any of the shots.

7            So only in conversation with Jim

8    about, you know, potential openings and things like

9    that, and his -- is all that I did in regard to

10   this observation about retaliation.

11        Q.   Mr. Petrucci, do you have a recollection

12   of ever discussing Mr. DeWees and/or his situation

13   at DCP with any of the other Commissioners?

14        A.   I don't recall.

15        Q.   Did Mr. DeWees ever complain that he was

16   being dragged into work or pulled into work and

17   misused in retaliation for speaking out,

18   specifically -- strike that.  Let me -- let me go

19   back.

20             Did Mr. DeWees ever complain that

21   his particular function in the prison was

22   intentionally, the keeping of records, was

23   intentionally understaffed by the Warden?

24        A.   I recall no such conversation.


                                                    45


1         Q.   Do you recollect any conversation where

2    Mr. DeWees complained that he was being retaliated

3    against in the form of being dragged back or pulled

4    back by the prison -- by the Prison Warden, by

5    Dominick DeRose just to punish him for speaking

6    out?

7       A.   I recall no conversation like that.

8       Q.   Did James DeWees ever say to you that he

9    felt he was being set up and pressured to get him

10   off the job, to drive him off the job?

11      A.   I do not recall.

12      Q.   What were the reasons why you felt it

13   might be worth exploring another employment option

14   for James DeWees as opposed to approaching Warden

15   DeRose and talking to him about it?

16      A.   Well, I felt that the character of Jim,

17   which is a good hearted person, became a natural

18   sort of safety valve for some of the guards who

19   poured theirself out to him.

20           And this was sort of like a natural

21   thing that would occur in any institution, and

22   therefore, he suffers the consequence of fitting

23   that -- that position.

24           Is there any kind of way to rectify

                                                      46

1    it?  I didn't see any other way to do it.

2       Q.   Did you feel that Dominick DeRose would

3    not be receptive to discussions about Jim's

4    problems?

5       A.   I brought them up at the Prison Board.

6              I tried to create a -- processes and

7    procedures that would allow for formalizing of

8    complaints, so that they would be directed toward

9    independent kinds of bodies rather than

10   departmental hearing kind of situations.

11              But they were generally discounted

12   at the Prison Board Meetings.

13       Q.   Did Commissioner Henry discount them?

14       A.   I cannot recall.

15       Q.   Did you ever hear of a -- strike that.

16              Did Mr. DeWees ever indicate to you

17   that a prisoner, a female prisoner had been very

18   badly beaten at the prison, and was put into a

19   holding cell to keep -- to keep her quiet while

20   other officials at the prison threatened prisoners

21   who viewed the beating that they should not respond

22   to official inquiry, that it never occurred?

23       A.   I recall nothing about any conversation

24   along those lines.

                                                        47

1        Q.   Do you have a recollection of being

2    informed by Mr. DeWees or others that pictures that

3    were taking -- taken of the -- of the prisoner and

4    the beating that she received were suppressed by

5    Major Stewart and others at the prison in violation

6    of criminal and civil law?

7        A.   I recall no conversations with Jim or

8    others with regard to that.

9        Q.   Did Mr. DeWees ever complain to you about

10   Major Stewart striking inmates?

11       A.   I do not recall any conversations in

12   regard to physical attacks on inmates by guards,

13   other than rough treatment from an ankle incident.

14   That's the only one that I really recall being

15   brought to my attention.

16       Q.   Do you have a recollection of that

17   involving Lieutenant Rose?

18       A.   I don't recall any individuals involved

19   in that.  I don't recall.

20       Q.   Do you have a recollection of where that

21   -- that allegedly occurred in or about an

22   elevator?

23       A.   I have no recollection.

24            MR. BAILEY:  Mr. Petrucci, let me step

                                                48

1    outside.

2            May we suspend?

3              VIDEOGRAPHER:  11:59.  The date is

4    September 8, 2003.  The tape is suspended.

5                   (Recess taken.)

6              MR. BAILEY:  Okay.  Please be advised

7    there's a tape recorder being run again.

8              VIDEOGRAPHER:  The time is 12:04.

9    Resuming the deposition of Commissioner Petrucci.

10   BY MR. BAILEY:

11       Q.   Do you have a recollection at one of the

12   Prison Board Meetings of raising a question of

13   whether a camera should be put in the mail room?

14       A.   I recall raising the issue --

15       Q.   Okay.

16       A.   -- Of cameras being more utilized

17   throughout the prison.

18       Q.   Did you --

19       A.   That mail room included, and in the room

20   where we keep inmate articles.

21               And but maybe for throughout the

22   prison for security purposes and safety purposes.

23       Q.   Do you know whether prisoners have access

24   to the mail room?

                                              49

1        A.   I do not know.

2       Q.   If prisoners do not have access to the

3  mail room, do you have a recollection of you

4  whether you knew there was any particular

5  significance to acts, to the mention of a camera in

6  the mail room, if you specifically mentioned it?

7       A.   I don't recall specifically mentioning

8  the mail room, or any issues relating to the mail

9  room other than the magazine issue.

10      Q.   Okay.  The magazine issue is raised

11 specifically by you?

12      A.   No, no, no, that was not a part of the

13 conversation.

14           MR. LAVERY:  You misunderstood.  That was

15 raised to him by somebody.

16           MR. BAILEY:  Yeah.

17           THE WITNESS:  And that is the only issue

18 that I ever recall largely dominating the mail

19 room.

20              But I do recall other issues from

21 other clients of conversations about missing

22 articles.

23              And more importantly, was officer

24 behavior to me in regard to the cameras.  That was

50

1     my focus of insisting that we take a look at the

2     camera situation.

3                    Also cut down on the costs.  I was

4     thinking the cameras could be used for producing

5     suicide watch personnel.  So we can have one person

6     watching three cameras instead of one officer

7     watching.

8     BY MR. BAILEY:

9          Q.   Let me go through a list here.

10                   Do you have a recollection of

11    Mr. DeRose -- Mr. DeWees ever mentioning Deputy

12    Warden Carroll by name connected with any complaint

13    or any matter of concern?

14         A.   I do recall in several of our discussions

15    that Mr. Carroll was mentioned.

16         Q.   Do you know -- but you don't know whether

17    she had -- (Inaudible.)

18         A.   There were a multitude of issues over

19    time, and I can't recall specifically the nature of

20    them.

21         Q.   Did Mr. DeWees ever complain to you about

22    an alleged gun incident with a James Hill?

23                   I don't think Mr. Hill, by the way,

24    was an inmate.

1      A.   No, no, he was a correctional officer,

2   and I do recall the issue, but I'm not sure again

3   whether it was Jim or the Warden or who.

4                I think that the Commissioners were

5   made aware of Mr. Stewart's behavior in regard to

6   that, and the Commissioners were informed of

7   inspectors, prison inspectors were inquiring of the

8   Warden what kind of punishment ought to be meted

9   out to the Major for the incident.

10     Q.   Do you have a recollection of Mr. DeWees

11   mentioning with you an allegation that Major

12   Stewart had hit an inmate who was tied down in a

13   restraint chair?

14     A.   I recall no conversations in regard to

15   Major Stewart hitting anybody.

16     Q.   Okay.  Do you have a recollection of

17   Mr. DeWees relaying to you a pervasive problem of

18   Mr. Carroll playing games on the computers?

19     A.   Yes.

20     Q.   Do you have a recollection -- I think you

21   already indicated that he, "he" being Mr. DeWees

22   had raised issues of (Inaudible) --

23     A.   Yes.

24     Q.   Did you have a recollection of Mr. DeWees

1    ever relaying to you allegations or information

2    about Lieutenant Honney bragging about the practice

3    of beating inmates?

4         A.   I'm afraid I don't recall that

5    conversation.

6         Q.   You indicated, I think, earlier you had a

7    recollection of the inmate's ankle, but you don't

8    know who was involved in that?

9         A.   Yeah.

10        Q.   Was there a discussion at the Prison

11   Board by yourself and/or others about Mr. Carroll

12   and Mr. Stewart taking time off without putting in

13   proper paperwork?

14        A.   I recall no conversations by the Warden.

15        Q.   I didn't think an allegation was an issue

16   -- (Inaudible).

17             Did Mr. DeWees ever talk to you

18   about having to testify in the Christopher Lewis

19   lawsuit, and that -- and expressing a fear,

20   concern, about all that he knew or -- or was told

21   to say, anything like that?  Do you remember

22   anything having to do -- let me simplify this.

23             Do you have a recollection of Mr. --

24   any specific recollection of Mr. DeWees talking to

53

1    you about the Christopher Lewis lawsuit?

2         A.   I do not recall.

3         Q.   Now, Mr. DeWees -- strike that.

4              Did you at different times over the

5    years raise concerns or questions during

6    conversations with Mr..DeWees about what was going

7    on?

8              In other words, ask him questions

9    about what was going on?

10        A.   I may have.

11        Q.   Do you have a recollection of what you

12   may have asked him?

13        A.   I am, as Chairman, concerned about the

14   deportment, the morale, the safety, and everything

15   in regard to the prison.

16             And so all issues are brought to my

17   attention are of concern, and I do not recall

18   specifically discussing any issues.

19             But if the issues of the guards

20   where they do not feel that there is fairness among

21   the CEOs, raises issues of emotion, overtime

22   assignment, other kinds of issues, then I'm

23   concerned.

24             And I may have discussed that with

54

1    Jim.  I may not have.  I do not recall.

2         Q.   Did Mr. DeWees ever complain to you that

3    Warden DeRose had become uncontrollably deranged in

4    his office on one occasion, to the -- to the point

5    that Mr. DeWees was complaining that Warden DeRose

6    lost control of himself?

7         A.   I don't recall any conversation in that

8    regard.

9              MR. BAILEY:  I don't have anything

10   further.

11             MR. LAVERY:  A couple clarifying.

12   (Inaudible.)

13

14                      EXAMINATION

15

16   BY MR. LAVERY:

17        Q.   With respect to the ankle stomping

18   incident, you said you recall being advised of

19   that?  Do you remember that testimony?

20        A.   (Nodding head.)  (Non-verbal response.)

21        Q.   You have to say "yes."

22        A.   Yes.  I'm sorry.

23        Q.   Do you recall whether it was Mr. DeWees

24   or someone else who brought that issue to your

1    attention?

2        A.   I do not recall how that conversation

3    ensued.

4        Q.   Do you have a specific recollection of

5    Mr. DeWees mentioning that incident to you?

6        A.   I do not recall.  I had conversations

7    about that issue with several people.

8                 I -- I probably did, but I can't

9    recall.

10       Q.   Now, you said that Mr. DeWees made a

11   complaint with respect to alleged retaliation

12   because of guards coming to him as some sort of a

13   safety valve (inaudible); do you remember that

14   testimony?

15       A.   Yes.

16       Q.   From your own personal knowledge, do you

17   know if Mr. -- what Mr. DeWees was telling you was

18   true or not, of your own personal knowledge?

19       A.   I have no way of knowing whether it was

20   true or not.

21                 But I sensed that -- that Jim was

22   feeling a lack of confidence in his position, and

23   that it had led to some situations where he was not

24   comfortable with what was happening.

56

1          But other than just picking up this

2     -- this sense, I have no way of knowing whether it

3     was true or not.

4               But I certainly sympathized with the

5     possibility that this could happen and --

6          Q.   And that's why you tried to arrange for

7     (inaudible) --

8          A.   Why I tried.  Yes, because I had no other

9     way of finding out or responding, other than what

10    we tried to do.

11         Q.   In terms of time, you don't know -- you

12    don't remember when that was; is that correct?

13         A.   I'm afraid not.  I just don't know when.

14         Q.   As I understand your testimony,

15    Mr. Petrucci, at no time did you ever advise Warden

16    DeRose that Mr. DeWees had come to you with these

17    complaints; you kept his complaints in confidence;

18    is that your testimony?

19         A.   Yes.  I did not tell the Warden of my

20    meetings with -- with Jim.

21               I did talk to the Warden about some

22    of the topics that Jim and I may have raised, and

23    tried to investigate some of those.

24          But never mentioned by name with Jim

57

1    DeWees.

2          Q.    Okay.   Jim's complaints?

3          A.    Yeah.

4          Q.    When you testified before that, do you

5    recall Mr. DeWees raising the issue of members of

6    the administration; is that right?

7          A.    Uh-huh.

8          Q.    Is that "yes"?

9          A.    Yes.

10         Q.    Did I understand your testimony also that

11   you don't know what time that was?

12         A.    That was more recently.   So that could

13   have been in the last year or two.

14                My recollections are that most of my

15   conversations with Jim are earlier than that.

16         Q.    Do you know for certain whether it was

17   within the last year or two, or do you recall the

18   conversation, or is it possible that was earlier?

19         A.    It could have been earlier.   So I'm not

20   certain at the time.

21         Q.    Do you know whether it was before Warden

22   DeRose's back surgery?

23      A.    I have no clue.

24            MR. LAVERY:  That's all.  Thank you.

                                              58

1                    FURTHER EXAMINATION

2

3   BY MR. BAILEY:

4      Q.    My last follow-up is really very simple.

5                 When you discussed the issue of the

6   pay differential for Deputy Wardens, Mr. DeWees'

7   name, I understand, was not named by a source to

8   you -- as a source by you, but his name certainly

9   came up because it was specific to him?

10     A.    I'm not sure I understand the question.

11     Q.    Okay.  When the issue was raised of

12  Warden DeRose about the pay differential --

13     A.    I had a discussion with the Warden about

14  that, yes.

15     Q.    Yes.  You did not reveal that Mr. DeWees

16  was the -- was the source that complained about

17  that because you don't remember whether Mr. DeWees

18  brought it up, or whether it originated with him?

19     A.    Yes, exactly.

20     Q.    My question is:  During that discussion

21  with Warden DeRose, certainly because it was

22    specific to Mr. DeWees, his name came up, however?

23         A.   Yes.

24              MR. BAILEY:  Okay.  That's all.

59

1              THE WITNESS:  Yes.

2              MR. LAVERY:  That's it.  Thank you.

3              THE WITNESS:  Okay.

4              VIDEOGRAPHER:  The time is 12:19.  The

5    day is September 8, 2003.  This is -- concludes the

6    deposition of Commissioner Petrucci.

7

8                   (END OF TAPE.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

60

1

2

3

4

5

6

7

8          I, ANTHONY PETRUCCI, state that I
have read the foregoing transcript of the testimony
9   given by me at my deposition on September 8, 2003,
and that said transcript is a true and accurate
10   record of the testimony given by me at said
deposition except as I have so indicated on the
11   errata sheets provided herein.

12                    Correction Pages attached.

13

14

15                    ANTHONY PETRUCCI

16

17   SUBSCRIBED AND SWORN to
before me this     day
18   of          , A.D. 2004.

19

20
       Notary Public

21

22

23

24



                  61



1   STATE OF ILLINOIS )
                  ) SS:
2   COUNTY OF  C O O K)

3

4

5         I, Wanda Arakaki Leopold, a

6   certified shorthand reporter, do hereby certify:

7         That the foregoing transcript was

8   transcribed by me from a videotape tendered to me

9   on November 25, 2003, was thereafter reduced to

10  typewriting via computer-aided transcription under

11  my personal direction, and constitutes a true

12  record of the testimony given and the proceedings

13  had;

14        That the reading and signing by the

15  witness of the transcript was not waived;

16        That I am not a relative or employee

17  of attorneys or the parties hereto, nor am

18  interested directly or indirectly in the outcome of